## Supreme Court of the Independent Order of Foresters v. Sarah Knowles.

### Gen. No. 11,095.

1. BILL OF EXCEPTIONS—*when, properly signed and sealed.* A bill of exceptions is properly signed and sealed, by the judge who presided at the trial thereof, in the county for which he was regularly judge, notwithstanding the case was presided over by him while acting as judge of another county.

Action of assumpsit upon benefit certificate. Appeal from the Circuti Court of Cook County; the Hon. CHARLES H. DONNELLY, Judge, presiding. Heard in the Branch Appellate Court at the March term, 1903. Reversed. Opinion filed April 22, 1904.

**Statement by the Court.** Appellant, a fraternal beneficiary society, appeals from a judgment for $3,825 rendered against it in favor of appellee, upon a policy issued by it on the life of her husband, William Knowles.

The policy is for $3,000 and is dated January 4, 1896. The application for it is dated November 26, 1895, and in it the insured states that he was then " in good, sound mental and physical health." To the examining physician he said, and it was so written down in his presence and signed by him, that he had never had asthma, loss of consciousness, bronchial trouble, throat trouble, chronic cough or any other of the numerous diseases inquired about by insurance companies and fraternal societies previous to issuing their policies. The question whether he had consulted or been attended by a physician "during the last five years," he answered in the negative. When asked whether there was anything to his knowledge or belief in his physical condition, family or personal history or habits, tending to shorten his life, he answered there was not. He signed a certificate at the bottom of the medical examination stating that " the answers to each and all of the above questions, also those made to the medical examiner, are true and correct, and that no intentional omission, concealment or mental reservation has been made of any

material fact or circumstance relating to my past or present health, habits or condition, or as to my family history, and I agree that the questions and answers herein contained shall form a part of my contract with " appellant.

In February, 1896, about six weeks after the issuing of the policy, Knowles became seriously ill of asthma and remained under the physician's care and treatment until the following November, during which time he was more or less confined to his house. In December, 1896, the asthma became much worse and developed into tuberculosis from which he died March 24, 1897.

WILLIAM C. SCHAEFER and CLARK VARNUM, for appellant.

JOHN C. KING and WILLIAM J. KING, for appellee; ALFRED E. CASE, of counsel.

MR. JUSTICE STEIN delivered the opinion of the court.

First. A motion has been made and reserved to the hearing to strike the bill of exceptions from the files on the grounds that it is not sealed by a judge of the Circuit Court of Cook county; that it is signed by Charles H. Donnelly, a judge of the 17th judicial circuit while acting as a judge of said circuit; that it was not settled, signed or sealed by a judge of the Circuit Court of Cook County, or within said county, and that it was settled and signed without the knowledge or consent of appellee's attorneys and was signed before they had been permitted to examine it.

The cause was tried before the Honorable Charles H. Donnelly, a judge of the 17th judicial circuit, while acting as a judge of the Circuit Court of this county. The bill of exceptions was filed on February 24, 1903, and is signed as follows: " Charles H. Donnelly [SEAL], Judge of the 17th judicial circuit of Illinois and acting Circuit Judge of the Circuit Court of Cook county, Illinois, at the trial of the above entitled cause." March 9, 1903, appellee moved the Circuit Court to strike the bill from the files for the reason, as stated in the affidavit of Alfred E. Case, one of her attorneys, that " affiant * * * was informed that said

Schaefer (one of appellant's attorneys) * * * took said bill of exceptions to the city of Geneva, in the county of Kane, in the State of Illinois, and then and there presented said bill to Judge C. H. Donnelly, who then and there signed and approved the same without the knowledge or consent of affiant." This motion was overruled four days later, and thereupon and before the time for filing the bill of exceptions had expired, " on motion of defendant's attorney the court now here in open court resigns and reseals said bill of exceptions." The affidavit does not state that the bill was signed in the county of Kane. Affiant only says he was so informed and does not even disclose the sources of his information. But assuming that the affidavit is sufficient in that regard and (what may well be doubted) that the verity of the record showing a proper signing and sealing of the bill may thus be overcome, the question arises whether Judge Donnelly had power to sign and seal it at Geneva, in the county of Kane, outside of this circuit. We entertain no doubt that he had. In City of Chicago v. South Park Commissioners, 169 Ill. 387, the Supreme Court say (p. 389) : " It is not essential a bill of exceptions shall be signed in open court. It is the act of the judge and not of the court, and he need not be attended by clerk or bailiff at the time (3 Ency. of Pl. & Pr., p. 456, note 3)." Note 3 thus approvingly cited declares the law to be : " Where a trial judge exercises a general jurisdiction coextensive with the state, it is immaterial in what part thereof the bill is signed " (citing cases). In so far as Nester v. Carney, 98 Ill. App. 630, lays down a different rule, we cannot follow it. The attention of the Appellate Court does not seem to have been called to Chicago v. South Park Commissioners, *supra*, and the case is not cited nor referred to by them. But even were this not the rule, the motion to strike the bill of exceptions from the files would still have to be denied, inasmuch as it appears that the bill was resigned and resealed by Judge Donnelly in open court in this county within the time limited therefor.

Second. Many errors are assigned, but in the view we take of the case we shall consider only one, to wit, that the

verdict is against the evidence. It is contended that the policy was obtained by fraud, that the insured, William Knowles, made false and fraudulent statements concerning the state of his health in order to obtain it, and that before and at the time of its issuing he was in an advanced stage of tuberculosis arising from asthma.

Charles Johannes, called by appellant, testified that he was night foreman of the Merchants' Parcel Delivery Company, knew the insured and was at his place of business in the fall of 1896. "I was at that time a member of Court Chicago (a subordinate lodge of appellant of which the insured was also a member). There were then present Mr. Knowles, Mr. Culp, Mr. Spies and myself. We had a conversation with Knowles in reference to his health. He said he had been suffering with bronchial trouble for quite a number of years; that when he was Chief of Police of Montreal, Canada, he had to resign his position for that cause. * * * He said he was taking treatment right along, I think it was at the Copeland Institute; * * * he didn't state much, only he was suffering all the time, and when he was working he was bothered with throat trouble every once in a while, * * * and he would get kind of dizzy and go forward; he didn't mention the name of any disease, only his bronchial trouble."

Nettie C. McKay, witness for appellant, knew the insured in 1889, and in 1889 or 1890 lived right opposite where he had his place of business. "My father got clothes of Mr. Knowles and I went with him as often as necessary to fit the clothes. I am in the dressmaking business. There was a conversation at Knowles' place of business in 1889 or 1890 with reference to his health. * * * My father had just received a pension for asthma. * * * Mr. Knowles told him he had suffered from asthma and gave him the remedy for it; told him he used stramonium leaves with nitre and smoked it; that it was a relief for asthma. * * * Said he had had it for a number of years, for some time, and suffered a great deal from it."

Hattie Hench, witness for appellant, knew insured and

was employed by him ; entered his employment beginning of March, 1895, and remained with him a little over a year, until May, 1896. " Saw Knowles about his place of business every day during all that time. In March, April or May, 1895, heard him say he was taking treatment. Have seen him take medicine and use the inhaler every day, sometimes more than once, and have seen him faint while he was pressing ; he fell behind the press-table and Mr. Spies picked him up. Mrs. Knowles assisted him. Knowles said he had bronchial trouble and asthma. I saw him from March, '95, to November 25, '95, use the inhaler every day and sometimes oftener, according to how he would feel. * * * When the weather was cloudy or damp it would be hard to breathe for him. I heard him say he was watching for a day when he would feel extra fine so he could be examined, for he was thinking of joining this lodge. Heard him tell that to Mr. Spies. The lodge he mentioned was the Foresters, the same lodge Mr. Spies joined." The witness testified further that she heard him say he was taking medical treatment at the Copeland Institute, and he would pour the medicine, a brown liquid, into the inhaler and it would smoke and give out a peculiar odor. " He told Mr. Spies in my presence he was using the inhaler for asthma and his bronchial trouble. I saw him bring to the store there medicines and the inhaler." He got the medicine from the Copeland Institute; had bottles of medicine at his place all the time up to the fall of 1895 when witness stopped working for him. She " observed his breathing ; he breathed very hard. Some days he could scarcely stand; he would rest his body, rest himself on his hands and then sit down when he would get too weak to stand. * * * I would see hard breathing and hear a sound, a wheezing sound." On cross-examination the witness said that as soon as she went to work for Knowles she noticed something was the matter with his breathing; it was quite loud all the time; could hear him breathing at the cutting-table, some distance away. Saw him resting on his hands very often, every day. The difficulty in breathing contin-

ued all the time she was there, until the middle of May, 1896.

George Spies, witness for appellant, resided in Chicago since 1881 and entered the employ of William Knowles, who was a tailor, in the latter part of March, 1892, and worked for him until the latter part of the following June. While working there he saw him use an inhaler and Knowles told him he was using it to relieve his heavy breathing; that he was suffering somewhat from asthma which he had contracted while quite young. He was using a preparation known as Beebe's Inhaler. "I have seen him inhale; take some medicine out of a bottle, pour it into the other bottle which had a stem protruding through the cork of the bottle; a reed stem; seemed to be a kind of home-made affair. * * * He leaned over it, blowed into it to agitate it and seemed to inhale the fume, and the odor could be detected at quite a distance. * * * I have seen him use the inhaler sometimes once or twice a day. On cloudy days and bad weather he had recourse to it sometimes three or four times a day. * * * His breathing was heavy on cloudy and misty days and when I was in close proximity to him I could always hear a kind of wheezing sound; sometimes I could hear that at a distance of from five to ten feet." The witness again went to work for Knowles in November, 1894, and continued with him until June or July, 1896. From November, 1894, until November 29, 1895, when Knowles joined the appellant's lodge, the witness noticed his breathing was heavier than before and saw him use the inhaler almost daily. In the spring of 1895 Knowles told him he was taking treatment at the Copeland Medical Institute and saw him bring medicine from there which he kept on the wash-stand in the back part of the store. This he kept up until late in the fall. He took treatment at the Institute continuously and every time he went to consult the physician, he told the witness he was going down to the Institute and that they advised him to take frequent walks in the parks and stay out in the fresh air as much as possible. The witness frequently saw

him using the medicine which he brought home during that time in the shape of bottles. The labels on them read " Copeland Medical Institute." " I also became a member of this lodge of the Foresters. On the day when I took the medical examination, he (Knowles) told me he would have to wait a favorable day in order that the doctors could not catch onto his real state of health and said he was going to prepare for it, and he used the inhaler oftener than I ever saw him use it before. * * * From November, '94, to November, '95, I observed his breathing to be very heavy. At the least exertion his breathing would be that way. Have frequently seen him working at press tables; saw him faint at the press table one day in October, '95. * * * He was pressing and all at once he seemed to lean over the table just as if he was looking for support and he fell back and down on the floor. At the time I was sitting at the table and went over and picked him up. My first impression was that he was lifeless. I set him on a chair and gave him some water and then he came to. He requested me to rub him right here on the back (indicating), for what purpose I didn't know. Kept it up for quite a while. The reason he went to the Copeland Medical Institute he said was that he was taking treatment for asthma and bronchial trouble. * * * I only saw him bring medicine from the Copeland Institute, and the Beebe Inhaler. I purchased that for him several times myself." On cross-examination the witness said that Knowles' health when he went to work for him in 1894 was worse than before. He could hear his breathing at a greater distance, about ten feet away, and it was always labored. " I was on intimate and friendly terms with Knowles and Mrs. Knowles. She was around there most of the time. I was friendly with her. I had nothing to complain of."

J. J. Driscoll, called by appellant, testified that he was a physician and surgeon since 1891, practicing all over the city and outside; that he examined the insured November 29, 1895, and asked him separately each question contained

in the examination paper and he answered it just as it is in there, the witness himself writing down the answers. Knowles said he was of a long-lived family; that his grandfather and grandmother lived from 100 to 110; that he did not know any of them that lived less than ninety-seven; that he had never been sick in his life and positively had never had a physician. This witness was one of the medical examiners of the court joined by Knowles, but had nothing to do with passing upon his fitness as a proposed member. All he had to do was take his statement. In February, 1896, he was called on to treat him and found him in bed suffering from obstructed or asthmatic breathing. Wherefore he asked him, " How is it that you have asthma, Mr. Knowles? You stated positively when I examined you that you never had any disease." Knowles evaded answering the question and the witness said, " You made misstatements. If the Foresters find it out they will expel you." His answer was, " To hell with the Foresters; G—d d—n their expelling power. I am in now." Knowles then said to witness that he had had this trouble, the asthma, for years; had had to give up the mounted police position in Montreal on account of asthma. His wife, who was present, remarked that her husband as long as she knew him had suffered from these asthmatic attacks; at times he would be apparently in good health and then these spells would come on. The witness was in professional attendance upon Knowles from the middle of February, 1896, until the following fall, and observed difficulty in his breathing, " what we call asthmatic breathing." He was very much emaciated and had lost strength and weight. The last time he saw him was in February, 1897, when he had consumption. When first called upon to attend Knowles, which was February, 1896, the asthmatic spells were severe and combined later with a cough which caused a partial rupture on one side in the abdominal region. He had developed bronchio-ectelic cavities in the bronchial tubes from the difficulty in breathing. Three or four cells of the lungs were ruptured into one through the breathing difficulty. When Knowles had

these spells in February, March and April, 1896, he would get black in the face and take all positions; "would try to lean forward this way (indicating) and then you would think something was going to kill him right there. He would take hold of anything, lean forward so as to get his breath; you would think it was impossible; that there was some obstruction down in the bronchial tubes. You would hear all kinds of noises, what you call bronchial rales; a wheezing sound. * * * I gave him introtracheal injections of creosote and olive oil down into the lungs. * * * I know from my treatment of him from February up to the latter part of February, '96, that his case was one of chronic asthma of long standing. It was what we call the end of asthma; the winding up of it." On cross-examination the witness said that he had always been on friendly terms with the insured and had no reason at any time to be unfriendly; that he was entirely disinterested and was " Knowles' friend in everything."

William Rorke, another witness for appellant, had known Knowles since early in 1895 and went into his store in May or June of that year. He noticed a difficulty he had in breathing, "a kind of rattling or wheezing sound." The witness, who was a fellow-member with Knowles, belonging to the same court he did, also testified to his telling him that he had been obliged to give up his position in Montreal on account of having throat or bronchial trouble, asthma, and not being able to stand the night air.

On behalf of appellee, David White testified that he had known Knowles for six or seven years, who was a strong man and always well until six or seven months before he died ; that he had never heard him breathe " any unnatural."

James E. Stuart, another witness for appellee, became acquainted with Knowles in 1892 and met him quite often for several years. He was a member of a military company of which the witness was the commanding officer. Knowles became a member when it was formed in 1892. The drills took place, as a rule, once a week. Knowles

650      APPELLATE COURTS OF ILLINOIS.

VOL. 113.]   Sup. Court. Ind. Order of Foresters v. Knowles.

participated in them and in the street parades.  His health
was good " so far as I could judge."  The witness never
noticed any difficulty in breathing and drilled the company
very hard in the streets and for hours in the hall.  The
weather was not always pleasant when the drills took place.

Charles McClellan, witness for appellee, a physician and
surgeon, had examined Knowles about 1894 for insurance
in some beneficiary society and thought he found him in
sound health and passed him; observed no disease; would
not have passed him otherwise.

Albert E. White and his wife, a sister of appellee, testi-
fied substantially to the same effect as David White.  Al-
bert E. White had known Knowles about seventeen years;
Mrs. White about twelve or fourteen years.

Appellee, in her own behalf, testified that she married
the insured January 23, 1894, and had never known him to
be troubled with asthma; that the fainting spell mentioned
by the witness Spies was in the spring of 1896; that his
health before he became a member of appellant's court was
very good.  On cross-examination she said that she had
seen her husband use the inhaler, but not every day; that
he had bottles of medicine in the summer of 1895 which
were labeled " Copeland Medical Institute;" that during
that spring and summer he went to the Institute for treat-
ment; that he kept the bottles in the shop, but not in the
house, and she saw him use the Beebe inhaler in the sum-
mer of 1895.

The foregoing is a summary of the testimony in the rec-
ord relating to the insured's condition of health before he
became a member of Court Chicago and made application
for the policy sued on, and from it we are satisfied that he
practiced a deliberate fraud upon appellant in procuring it
to issue its policy.  The admissions of his wife upon cross-
examination confirm and corroborate the testimony of ap-
pellant's witnesses.  The minute details given by them in
respect of the insured, his habits, his medical treatment
and the language used by him when he was about to apply
for the policy and after he had obtained it, all show that

for many years before making the application he had been suffering from asthma and knowingly and intentionally concealed the fact from appellant. The witnesses for appellee in testifying that Knowles was in good health may have honestly so believed, although they were mistaken. The testimony of appellant's numerous witnesses stands upon a different basis. They either told the truth, or else were perjurers. No reason whatever appears and none is suggested why they should forswear themselves. They were disinterested and their utterances create the impression of truth.

The judgment appealed from is reversed with a finding of facts.

*Reversed.*